687 P.2d 354

**Florence WISTUBER, Peggy Deise and Florence Nelson, Plaintiffs-Appellants, Cross-Appellees,**

v.

**PARADISE VALLEY UNIFIED SCHOOL DISTRICT: Dr. Douglas L. Dickerson, Superintendent; Board of Trustees, Thomas Horne, Eric Bistroe, Nancie Lane, Guy Loehn and John P. Morgan, Jr., Defendants-Appellees, Cross-Appellants.**

No. 17187.

Supreme Court of Arizona, En Banc.

June 20, 1984.

Smith & Curtis by Paul C. Jacobson, David W. Curtis, Phoenix, for plaintiffs-appellants, cross-appellees.

Lewis & Roca by John P. Frank, Walter Cheifetz, Phoenix, for defendants-appellees, cross-appellants.

FELDMAN, Justice.

Petitioners brought a special action, as taxpayers, to declare invalid a portion (Proposal 98) of a collective bargaining agreement between the Paradise Valley Unified School District (District) and the local Classroom Teachers' Association (Association). Petitioners allege that Proposal 98 violates Ariz. Const., art. 9, § 7.[1] The trial court entered judgment on the merits in favor of the District. The judgment was based on legal memoranda in lieu of trial, Proposal 98 and an affidavit of the Dis-

1. "Neither the State, nor any county, city, town, municipality, or other subdivision of the State shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation, or become a subscriber to, or a share- holder in, any company or corporation, or become a joint owner with any person, company, or corporation, except as to such ownerships as may accrue to the State by operation or provision of law." Ariz. Const., art. 9, § 7.

trict's Superintendent of Schools. Petitioners appealed and the District cross-appealed seeking attorneys' fees. We took jurisdiction on a motion to transfer pursuant to Ariz.R.Civ.App.P. 19(a), 17A A.R.S., to resolve an apparent conflict between two prior decisions of the Court of Appeals.

By its agreement with the Association, the District released the Association president from teaching duties but continued to pay a portion of the president's salary.[2] The Association paid the president an additional sum. In return for her released time the president agreed to pursue a number of activities and undertake duties that inure to the benefit of the District. These included providing information to a number of groups, meeting monthly and logging time with the Assistant Superintendent for personnel.[3]

In his uncontroverted affidavit the School Superintendent notes that "[i]f the Association President did not perform all of the above activities, the District would have to hire a full-time qualified person to perform them." He notes further that "the Association pays $6,800 of the Association President's annual salary and the District pays $19,200." He concludes that "the District is saving between $5,800 and $15,800 under the current arrangement compared to what it would have to pay if a full-time Director of Employee Relations were hired."

■ Nevertheless, petitioners assert that "Proposal 98 is void and illegal on its face as authorizing a gift of public monies to a private association" in contravention of Ariz. Const., art. 9, § 7. Given the stipulated facts, we find the contention without merit because (1) the agreement serves a public purpose and (2) there is neither donation *nor* subsidy to a private association.

■ It is axiomatic that a governmental body may disburse funds only for a public purpose. *Proctor v. Hunt*, 43 Ariz. 198, 201, 29 P.2d 1058, 1059 (1934) ("money raised by public taxation ... can only legally be spent for [public] purposes and not for the private or personal benefit of any individual"). In *City of Glendale v. White*, 67 Ariz. 231, 236, 194 P.2d 435, 438 (1948) this court stated "the term 'public purpose' is incapable of exact definition and changes to meet new developments and conditions of times...." The services performed by the Association President aid the District in performing its obligations. Her functions fit well within the Board's statutorily granted discretion to employ persons for other than classroom teaching. *See* A.R.S. § 15–343(A); A.R.S. § 15–502(A).

Petitioners argue that there is a conflict between two opinions of the court of appeals concerning the standard by which to measure whether there is a donation or

---

**2.** "The Board recognizes that the responsibilities associated with the presidency of the Association requires a considerable amount of the president's time. The Board agrees to free the Association president from his/her teaching duties two periods at his/her regularly scheduled teaching workday in addition to one regularly scheduled preparation period with no reduction in his/her regular salary.

\* \* \* \* \* \*

"The Association may choose to have the Association president released full-time from his/her teaching duties. In that case, the Association agrees to pay the district one-half (½) of BA Step 1 for the additional release time." Proposal 98.

**3.** "The Association President agrees [with the District] to:

"a. Provide communication with campus leaders, teachers, administrators, and community members which will contribute to positive

working relationships, and inform teachers, administrators, and Board members of potential problems;

"b. Attend school Board meetings as spokesperson for the teachers;

"c. Assist teachers in their awareness of procedures and in following these procedures;

"d. Appoint teachers to district committees;

"e. Assist in the processing of grievances;

"f. Confer with district administrators and board members on critical areas of concern to teachers;

"g. Seek information from a variety of sources on areas of concern to teachers;

"h. Represent members of the bargaining unit in hearings and in areas of concern;

"i. Meet with the Assistant Superintendent for Personnel on a monthly basis;

"j. Log time equal to 15 hours per week once every two weeks with the Assistant Superintendent for Personnel." Proposal 98.

subsidy in violation of art. 9, § 7. In *Heiner v. City of Mesa*, 21 Ariz.App. 58, 515 P.2d 355 (1973), a city sought to deed 10.9 acres of land to a private, non-profit hospital without consideration. The court of appeals rejected the constitutional challenge, and held that

> [t]he public benefit [the promise to use the hospital for care of the sick, a public purpose] removes the contemplated deed from the restrictions of § 7 of Article 9 of the Constitution *and constitutes a valid and valuable consideration under the circumstances presented to us in this case.*

*Id.* at 64, 515 P.2d at 361 (emphasis supplied).

This aspect of *Heiner* was disapproved by a different panel of the court of appeals in *City of Tempe v. Pilot Properties, Inc.*, 22 Ariz.App. 356, 362, 527 P.2d 515, 520–21 (1974). In *Pilot Properties* the city attempted to lease valuable property for a rental of $1.00 per year to a professional baseball team in return for the lessee's agreement to build a ballpark for use, *inter alia*, as a municipal ballpark. At the end of the lease term the ballpark would revert to the city. The court found that the propriety of the transaction could not be decided in the abstract. The court stated that merely because the private entity "uses public funds or property for a 'public purpose' is not sufficient, in and of itself, to remove that use from the provisions" of the Constitution. *Id.* at 362, 527 P.2d at 521. There must also be "consideration" which is not "so inequitable and unreasonable that it amounts to an abuse of discretion," thus providing a subsidy to the private entity. *Id.* at 363, 527 P.2d at 522 (quoting *City of Phoenix v. Landrum & Mills Realty Co.*, 71 Ariz. 382, 388, 227 P.2d 1011, 1014 (1951)).[4]

The constitutional prohibition was intended to prevent governmental bodies from depleting the public treasury by giving advantages to special interests (*Industrial Development Authority of County of Pinal v. Nelson*, 109 Ariz. 368, 372, 509 P.2d 705, 709 (1973)) or by engaging in non-public enterprises. *State v. Northwestern Mutual Insurance Co.*, 86 Ariz. 50, 53, 340 P.2d 200, 201 (1959). Of course, either objective may be violated by a transaction even though that transaction has surface indicia of public purpose. The reality of the transaction both in terms of purpose and consideration must be considered. A panoptic view of the facts of each transaction is required. *Id.* at 53–54, 340 P.2d at 202. We believe the *Pilot Properties* rule to be the better one. The public benefit to be obtained from the private entity as consideration for the payment or conveyance from a public body may constitute a "valuable consideration" but the Constitution may still be violated if the value to be received by the public is far exceeded by the consideration being paid by the public. Of course, in reviewing such questions, the courts must not be overly technical and must give appropriate deference to the findings of the governmental body. Therefore, we confine the *Heiner* rule to its facts (see note 4, *ante*) and approve the rule expressed in *Pilot Properties*.

Petitioners argue that if the *Pilot Properties* rule is adopted as the law of this state the case must be remanded for a finding on whether the consideration paid by the District was equitable and reasonable in light of the services to be performed by the Association President. On these facts, we disagree. Acknowledging that many of the obligations imposed upon the Association President by Proposal 98

---

4. While *Heiner* and *Pilot Properties* are facially inconsistent concerning the adequacy of consideration necessary to comply with art. 9, § 7, *Heiner* may be confined to the "special case" of a municipality's relationship to a non-profit hospital. A.R.S. § 9–242 grants a municipality wide discretion in this area. *South Side Dist. Hospital v. Hartman*, 62 Ariz. 67, 153 P.2d 537 (1944). Thus, *Heiner* was based on statutory public policy as well as art. 9, § 7 and reflected the judiciary's long-held accordance of a special status to hospitals as "charitable institutions" operated solely for the public good. Under the facts of the case at bench, it is unnecessary to comment on the continued vitality of that status.

are duties which she might have performed in any event as Association President, it still seems obvious that the duties imposed upon her by the proposal are substantial, and the relatively modest sums required to be paid by the District not so disproportionate as to invoke the constitutional prohibition. Of course, we do not sit as finders of fact. The facts presented by the District in the affidavit of the Superintendent make a prima facia showing of proportionality. The petitioners had an opportunity to present evidence on disproportionality of consideration; instead, at the beginning of the trial, they chose to submit the matter on the legal memoranda, the affidavit, and the words of the contract. On this record it is apparent that they did not carry their burden and it is doubtful that they could have proved any serious disproportion in consideration. The *Pilot Properties* rule was satisfied. It was not the burden of the District to prove that its contract was reasonable. The burden of proof was on those who challenged that contract. *See City of Phoenix v. Landrum & Miller Realty Co.,* 71 Ariz. at 388, 227 P.2d at 1014. We will not assume disproportionality of consideration. ·

### Cross-Appeal for Attorney's Fees

█ The District claims it is entitled to attorney's fees under A.R.S. § 12–341.01. Under that statute attorney's fees may be awarded in an action arising out of contract in the context of a special action for mandamus relief.[5] *Ash, Inc. v. Mesa Unified School District No. 4,* 138 Ariz. 190, 193, 673 P.2d 934, 937 (App.1983). The District considers *Ash* new law and argues that the trial court, unaware that it could award such fees, used no discretion in denying the District's request for attorney's fees. We believe *Ash* simply applies the recognized precedents upholding a discretionary award of attorney's fees.

█ Moreover, this action differs from the type of contract action at issue in

*Ash.* Here, petitioners are challenging the constitutionality of the action of a public body. An award of attorney's fees would be contrary to public policy in this case because it would have a chilling effect on other parties who may wish to question the legitimacy of the actions of public officials. Where aggrieved citizens, in good-faith, seek a determination of the legitimacy of governmental actions, attorney's fees should not usually be awarded. Courts exist to hear such cases; we should encourage resolution of constitutional arguments in court rather than on the streets. If an action brought against a governmental body is groundless or frivolous, or is brought for the purpose of harassing that body, the court has discretion to award attorney's fees quite apart from any contractual theory. *See* A.R.S. § 12–341.01(C). On this record, we cannot find that petitioners' action falls within the scope of subsection (C).

█ The trial judge's failure to explain his reasons for a denial of attorney's fees does not mean he exercised "no discretion" nor does it indicate an abuse of discretion. We will not substitute our judgment for that of the trial judge. *Autenreith v. Norville,* 127 Ariz. 442, 444, 622 P.2d 1, 3 (1980). In view of the policy considerations noted above, we would have some difficulty affirming an award of fees in this case and find no abuse in the trial court's refusal to grant fees.

The judgment of the superior court is affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS, J., concur.

CAMERON, Justice, dissenting.

I respectfully dissent. I believe the Classroom Teachers Association (CTA) is being subsidized by the school district contrary to an article of the Arizona Constitution which reads:

---

5. *See* Rule 1, Rules of Procedure for Special Action, 17A A.R.S.; A.R.S. § 12–2021. There is considerable doubt that the procedure followed

is correct. *See Smoker v. Bolin,* 85 Ariz. 171, 173, 333 P.2d 977 (1958). The trial court did not reach this issue, nor do we.

Neither the State, nor any county, city, town, municipality, or other subdivision of the State shall ever give or loan its credit in the aid of, or make any donation or grant, of subsidy or otherwise, to any individual, association, or corporation, * * * except as to such ownerships as may accrue to the State by operation or provision of law.

Ariz. Const., art. 9, § 7. The affidavit of Douglas L. Dickerson, Superintendent of Schools of Paradise Valley Unified School District No. 69, agreed upon by the parties as the statement of facts in this case, states:

Under present circumstances, the Association President is released full-time from her teaching duties and has an annual salary of $26,000. Pursuant to the Bargaining Agreement, the Association is paying the District one-half of the BA Step 1 salary to defray the cost of the Association President's salary. In other words, the Association pays $6,800 of the Association President's annual salary and the District pays $19,200. Therefore, the District is saving between $5,800 and $15,800 under the current arrangement as compared to what it would have to pay if a full-time Director of Employee Relations were hired.

The contract provides that in return for this payment the president of the CTA shall:

a. Provide communications with campus leaders, teachers, administrators, and community members which will contribute to positive working relationships, and inform teachers, administrators, and Board members of potential problems;

b. Attend school Board meetings as spokesperson for the teachers;

c. Assist teachers in their awareness of procedures and in following these procedures;

d. Appoint teachers to district committees;

e. Assist in the processing of grievances;

f. Confer with district administrators and board members on critical areas of concern to teachers;

g. Seek information from a variety of sources on areas of concern to teachers;

h. Represent members of the bargaining unit in hearings and in areas of concern;

i. Meet with the Assistant Superintendent for Personnel on a monthly basis;

j. Log time equal to 15 hours per week once every two weeks with the Assistant Superintendent for Personnel.

This court held over fifty years ago that "appropriations may only be made by the direct authorization of the people, through the Constitution or an initiated act, or by an act of the legislature, which has plenary power over the expenditures of public money, except as restricted by the terms of the Constitution." *Proctor v. Hunt,* 43 Ariz. 198, 201, 29 P.2d 1058, 1059 (1934). In light of Proctor, the majority's citation to A.R.S. §§ 15–343(A) and –502(A) is misguided. These statutes merely give a broad hiring power for "employ[ing] professional personnel deemed necessary for making surveys and recommendations relating to the curricula, physical plant and other requirements of the district" and for "employ[ing] and fix[ing] the salaries of teachers, principals, janitors, attendance officers, school physician, school dentist, nurses, and other employees necessary for the succeeding year." These statutes, however, do not sanction the salary paid under Proposal 98.

Admittedly, we have stated that a private association's receiving some kind of benefit from a governmental act does not prevent that act from having a public purpose, *see Industrial Development Authority of County of Pinal v. Nelson,* 109 Ariz. 368, 373, 509 P.2d 705, 710 (1973); *Town of Gila Bend v. Walled Lake Door Company,* 107 Ariz. 545, 550, 490 P.2d 551, 556 (1971), but we have never stated what kind of balancing test should be utilized when weighing benefits received by the public body against benefits received by the pri-

vate association. The majority in the present case chooses to use a "valuable consideration" test, and states that "the Constitution may still be violated if the value to be received by the public is far exceeded by the consideration being paid by the public," supra, at 357. Because we are dealing with public funds, I would favor the more restrictive test followed by the Massachusetts Supreme Judicial Court:

Each case must be decided with reference to the object sought to be accomplished and to the degree and manner in which that object affects the public welfare. Frequently an object presents a double aspect in that it may in some respects result in conferring a benefit upon the public and in other respects it may result in conferring a benefit upon or in paying money to private individuals. In such instances the cases tend to distinguish between those results which are primary and those which are secondary or incidental and to classify the object according to its primary consequences and effects. At any rate it is plain that an expenditure is not necessarily barred because individuals as such may profit, nor is it necessarily valid because of incidental benefit to the public.

*Allydonn Realty Corporation v. Holyoke Housing Authority*, 304 Mass. 288, 292–93, 23 N.E.2d 665, 667 (1939). *Accord, Port Authority of City of Saint Paul v. Fisher*, 269 Minn. 276, 288, 132 N.W.2d 183, 192 (1964); *Wilmington Parking Authority v. Ranken*, 34 Del.Ch. 439, 452, 105 A.2d 614, 622 (1954). Under this "primary/incidental" benefit test, a court must determine who receives the "primary" benefit. If it is the government or municipality, the purpose is a public purpose. If it is the private individual or association, the purpose is a private purpose. In this case, I believe that the CTA receives the primary benefit. Out of the ten duties listed above, duties (a), (b), (d), (e), (f), (g), and (h) are, at the very least, heavily skewed in favor of benefiting the CTA as opposed to benefiting the district as an entity. In fact, the president of the CTA could properly perform all these functions as a representative of the CTA without being paid any amount by the school board. For example, under (b) the CTA president will "[a]ttend school board meetings as spokesperson for the teachers." Being a "spokesperson for the teachers" on its face indicates that it is the teachers who will be the primary beneficiaries and that any benefit to the school board will be only incidental. When we consider that there are also non-CTA teachers employed by the district, the direct and "primary" benefit to the CTA becomes more apparent. It is doubtful that the CTA president would represent the views of non-CTA teachers if a conflict in views should arise between these different groups. Another example where the CTA benefits at the expense of the board and the non-CTA member teachers is in the appointment of teachers to district committees. In his affidavit the Superintendent stated:

There are 137 positions for teachers on 18 District committees. District administrators and parents of students attending schools in the District also serve on these committees, which have been formed to review school-related activities such as staff development, professional growth, insurance, course curricula, etc. After conferring with the teachers on the subject of their suitability and willingness to serve, the Association President annually recommends teachers to fill the open committee positions. Given the benefit of this prescreening by the Association President, *his or her recommendations are always followed.*

(Emphasis added.) Virtual control over the district's committees is of primary benefit to the CTA and only an incidental benefit to the district, if, in fact, it is a benefit at all.

Even under the majority's own test, however, I do not believe this expenditure can pass constitutional muster. The district has virtually no control over the CTA president's execution of her duties. In fact, under the contract, the board has no control over who will be president of the CTA. That is determined by the membership of

the CTA and the president could be a person totally unsuited for the duties called for in the contract. Under Proposal 98, the president of the CTA is free to act in the best interest of CTA members, even though this may be to the detriment of non-CTA members or contrary to the best interests of the school district. In light of this fact, I do not believe that any assumed financial savings accruing to the district under the proposal can compensate for this loss of control. Thus, the value to be received by the public, financial savings, is outweighed by the consideration to be paid by the public, loss of control. What has happened here is that the board has "bought its peace" by paying the president of the CTA for duties which benefit the CTA at the expense of the board and non-CTA member teachers.

In conclusion, I believe that the value to be received by the school board is exceeded by the consideration to be paid by the board. The contract favors the CTA with very little benefit to the board. In other words, the cost to the public far exceeds the benefits to be received by the public. By whatever test, the "primary/incidental" benefit test, Allydone Realty Corporation, supra, or the "valuable consideration" test of the majority, the contract results in donation of public funds for a private purpose contrary to our Constitution.